995 A.2d 1082

Diane **HUBBEL**

v.

**BOARD OF TRUSTEES OF the FIRE & POLICE EMPLOYEES' RETIREMENT SYSTEM OF the CITY OF BALTIMORE.**

No. 2836 Sept.Term, 2008.

Court of Special Appeals of Maryland.

May 27, 2010.

Paul D. Bakman (Emily C. Malarkey, on the brief), Baltimore, MD, for Appellant.

Herbert Burgunder, Jr., and William R. Phelan, Jr. (George A. Nilson, on the brief), Baltimore, MD, for Appellee.

Panel: DEBORAH S. EYLER, MATRICCIANI, LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

RODOWSKY, Judge.

The appellant, Diane Hubbel, is the widow of Donald W. Hubbel (Cpt. Hubbel), who was a captain in the Baltimore City Fire Department. Appellant seeks line-of-duty death benefits from the appellee, the Board of Trustees of the Fire & Police Employees' Retirement System of the City of Baltimore (the Board). Appellant is aggrieved by the denial of her claim by the Board's Examiner and the affirmance of that decision by the Circuit Court for Baltimore City.

Cpt. Hubbel died on February 1, 2008, at his home in Bel Air, Harford County, Maryland. He suffered a fatal heart attack, at age forty-two, almost immediately after he had been running on a treadmill in his basement. The Baltimore City Code (2009), Article 22, "Retirement Systems," § 33($l$)(11)(iii)(A) (the Ordinance) provides that, if a claim against the Board is one for line-of-duty death benefits, the Board's hearing Examiner shall determine "whether the death arose out of and in the course of the actual performance of duty[.]" Appellant's claim is based upon the circumstances described below.

Cpt. Hubbel was a member and an assistant team leader of the fourteen-member Special Rescue Operations Team (the Team) of the Baltimore City Fire Department. As described

by the leader of the Team, Lt. Scott Michael Berbach, the Team responds to events that are above the daily duties of a normal firefighter, e.g., high-rise building fires, swift water rescues, and trench and building collapses. Even when not on duty at his regularly assigned station, Cpt. Hubbel, as a member of the Team, was on call twenty-four hours a day, seven days a week, unless excused.

Each member of the Team was required annually to pass a physical fitness examination which consisted of a one mile run, sit ups, and push ups. To pass the running portion of the test, a forty-two year old was allowed nine minutes. If a member of the Team failed the fitness test, the test could be retaken within six months. Any firefighter who again failed the fitness test could not remain on the Team. That person nevertheless continued his or her regular duties in the Department, but would not be paged for Team responses.

Members of the Team are chosen upon application, interview, and "eventually training and the physical fitness assessment." Members sign a written pledge to follow the policies for training and to be "physically prepared to do your job."

The City of Baltimore does not provide any physical fitness trainers, equipment or facilities for Team members. They are expected to maintain fitness on their own.

At the time of his death on February 1, 2008, Cpt. Hubbel was five feet ten inches in height and weighed 224 pounds. He had been running on his treadmill in preparation for his annual physical on February 8, 2008, and he had completed one mile in about eleven minutes. After cooling down, he got off of the treadmill, grabbed his chest, and fell over. He was pronounced dead on arrival at Upper Chesapeake Medical Center.

A postmortem examination of Cpt. Hubbel was performed the next day by a State Medical Examiner. Examination of Cpt. Hubbel's cardiovascular system revealed that "[t]here was 80% calcified atherosclerotic stenosis of the left main coronary artery, 70% calcified atherosclerotic stenosis of the proximal left anterior descending coronary artery and 95%

stenosis of the right coronary artery." The Medical Examiner certified the cause of death to be "Hypertensive Atherosclerotic Cardiovascular Disease."

In her application for line-of-duty death benefits, appellant described the circumstances of Cpt. Hubbel's death to be, "training for an upcoming drill given by BCFD." In response to the claim, the Board assembled the adult lifetime medical history of Cpt. Hubbel, consisting of approximately 190 pages. It did not include the report of the emergency medical technicians who first responded or the post-death records from Upper Chesapeake Medical Center. Among the medical records was the report of a cardiac consultation in March 2006, following a heart scanning which revealed significant calcification, mostly in the distribution of the left anterior descending artery. That report included Cpt. Hubbel's family history. His mother had coronary artery bypass grafting surgery at age thirty-two, had a heart transplant at age forty-nine, and had died at age fifty-six of lung cancer.[1] Cpt. Hubbel's father was alive and well in his sixties. At age fifty-nine he had had coronary artery bypass grafting surgery. The cardiologist's impression of Cpt. Hubbel was: "1. Abnormal heart scan. 2. Hypertension. 3. Hyperlipidemia."

At the hearing before the Examiner, each party introduced a written medical report which included an opinion. Dr. Jeffrey D. Gaber, M.D., FACP, who was engaged by the appellant, reported that he had reviewed the Fire Department records on Cpt. Hubbel, his training, the circumstances of his death, the autopsy report, and the Manual of Procedure Policy for the Team.[2] He stated that he was "unaware of the family history or any other medical issues." He concluded:

"Based on the information noted above, it is my opinion to a reasonable degree of medical certainty that the highly stressful nature of his career as a Baltimore City firefighter

---

1. The report noted that Cpt. Hubbel's mother was a heavy tobacco user.

2. Dr. Gaber was under the impression that the required run was two miles within eighteen minutes.

played a considerable role in the development of coronary artery disease. The coronary artery disease subsequently caused a massive heart attack, leading to his death. Furthermore, the training program that he had undertaken at home in order for him to meet the requirements of the Special Rescue Operations Team, played a significant role in the proximate cause of his death from an acute myocardial infarction."

The Board presented a report from John Parkerson, M.D., M.S. His report synopsised the medical records beginning in 1998. Dr. Parkerson concluded:

"Medical records on this 42–year–old male fire captain had been reviewed. There is no medical record about the exact circumstances of his death, but apparently he died while training in the fire department. The cause of death was atherosclerotic coronary artery disease. He had multiple non-occupational risk factors including family history, obesity, and hyperlipidemia. Early in the medical records, it was noted that he smoked an occasional cigar, but there is no further mention of his smoking in the succeeding medical records. The cardiologist noted a lack of exercise, but apparently he had an active job.

"His cardiac condition was based on his non-occupational risk factors. Regardless of his occupation, a coronary death was a predictable event. None of the providers recommended changing his job due to an increased cardiac risk, or attributed his cardiac condition to his occupation or workplace activities.

"In my medical opinion, his demise/incapacity was not the result of an injury arising out of and in the course of his employment. He had non-occupationally related coronary artery disease. The medical records do not support a causal connection to the performance of his job duties.

"My conclusions are based upon a chart review of the provided records and are made with a reasonable degree of medical certainty. Please do not hesitate to contact me

when more medical records are obtained or if further questions arise."

The Examiner found in favor of the Board and rested her decision on two grounds. She held that Cpt. Hubbel's "actions in exercising on his treadmill at home while off duty do not constitute the actual performance of his duties as a firefighter." This conclusion was predicated on the language of the Ordinance requiring that the injury arise in the course of the "actual performance of duty." The Examiner reasoned that "actual performance of duty" required a stricter interpretation than that applied in Workers' Compensation Act cases to the requirement that an injury be "in the course of employment." Maryland Code (1991, 2008 Repl.Vol.), § 9–101(b)(1) of the Labor and Employment Article (the Act). The Act defines "accidental personal injury" to mean "an accidental injury that arises out of and in the course of employment."

In addition, the Examiner relied on an alternative ground of decision. She said there was an issue of medical causation, namely, whether the claimant had "met the burden of proof to show that the exercise itself caused the heart attack." On this issue the Examiner concluded:

"In this case the Claimant had significant risk factors for heart disease. He was overweight, had high cholesterol and had a **strong** family history of premature coronary artery disease on the part of both his mother and father. I find the evidence of non-occupational factors to be so strong in this case, that it lends much greater credibility to Dr. Parkerson's opinion that the Claimant had non-occupational coronary artery disease, than to Dr. Gaber's opinion that occupational stress played a 'considerable role' in the development of the coronary artery disease. Also, I find Dr. Gaber's opinion, both regarding the causation of the underlying coronary artery disease, and the proximate cause of death, to be less than reliable because it was rendered without having the benefit of the significant family and personal history."

From the denial of line-of-duty death benefits, the appellant sought judicial review in the Circuit Court for Baltimore City. That court affirmed, relying on the Examiner's "actual performance of duty" analysis.

From that judgment, this appeal was timely noted. Here, the appellant submits that the Examiner made an error of law in interpreting "actual performance of duty" in the Ordinance and in rendering a decision that, appellant contends, was not supported by substantial evidence.

### Standard of Review

This Court restated the standard of review in *P Overlook LLLP v. Board of County Comm'rs of Washington County*, 183 Md.App. 233, 960 A.2d 1241 (2008):

"On appellate review of an administrative agency's decision, this Court reviews the agency's decision, and not that of the circuit court. *Anderson v. General Cas. Ins. Co.*, 402 Md. 236, 244, 935 A.2d 746 (2007). Appellate review of an agency's factual findings is limited to 'determin[ing] whether the agency decision is supported by substantial evidence in the record.' *Id.* The appellate court 'must not itself make independent findings of fact or substitute its judgment for that of the agency.' *Maryland–National Capital Park and Planning Comm'n v. Anderson*, 395 Md. 172, 180–81, 909 A.2d 694 (2006) (quoting *Baltimore Lutheran High School Ass'n v. Employment Sec. Admin.*, 302 Md. 649, 662, 490 A.2d 701 (1985)). With regard to the agency's legal conclusions, however, appellate review is less deferential; this Court can reverse the agency's legal decisions 'where the legal conclusions reached by that body are based on an erroneous interpretation or application of the zoning statutes, regulations, and ordinances relevant and applicable to the property that is the subject of the dispute.' *People's Counsel for Balt. County v. Surina*, 400 Md. 662, 682, 929 A.2d 899 (2007). Nonetheless, in determining whether the agency was erroneous in its legal conclusion, some deference is given to the agency and its expertise in administering the law is considered. *Id.* at 682–83, 929 A.2d 899

(quoting *Marzullo v. Kahl,* 366 Md. 158, 172, 783 A.2d 169 (2001))."

*Id.* at 247–48, 960 A.2d 1241.

## DISCUSSION

### I. In the Course of Actual Performance of Duty

#### A. Background Cases

Appellant contends that the Examiner erred as a matter of law when she concluded that the Ordinance's language, "in the course of the actual performance of duty," was more restrictive than the Act's language, "in the course of employment." Appellant relies on *Board of Trustees of the Employees' Retirement Sys. of the City of Baltimore v. Novik,* 326 Md. 450, 605 A.2d 145 (1992).

In that case, Ms. Novik, a City employee, was permanently incapacitated as a result of a slip and fall on ice on a City-owned parking lot provided for employees. She fell while walking from her car to the building in which she worked. The disability retirement statute on which the claim was based required that the injury be suffered " 'while in the actual performance of duty with the City at a definite time and place.' " *Id.* at 451, 605 A.2d 145. The agency administering the statute found in favor of the claimant, as did the circuit court and this Court. In the Court of Appeals, the City contended that the pertinent statute set up a stricter standard than did the Act, so that the employer's premises exception to the Act's "going and coming rule" did not apply under the retirement ordinance. Rejecting that argument, the Court quoted *Police Comm'r v. King,* 219 Md. 127, 134–35, 148 A.2d 562 (1959), to demonstrate that prior decisions of the Court of Appeals had " 'recognized a striking analogy between the terms "in the actual performance of duty" and "out of and in the course of his employment." ' " *Novik,* 326 Md. at 457, 605 A.2d 145. The *Novik* Court concluded by finding "the analogy between the workers' compensation and accidental disability pension statutes 'so close on the point at issue that we find no legal distinction in applying the principle.' " *Id.* at 461, 605

A.2d 145 (quoting *Heaps v. Cobb,* 185 Md. 372, 383, 45 A.2d 73 (1945)).

■ The "point at issue" and the "principle" applied in *Novik* was whether the employer's premises exception to the going and coming rule under the Act applied under the retirement statute. The Court held that it did. The "point at issue" here is whether Cpt. Hubbel's death, at home, and while off duty, following running on a treadmill in preparation for an employment-related, physical fitness test, was a line-of-duty death. Appellant's argument—a statutory interpretation error by the Examiner—would have merit only if the Act's "course of employment" and the Ordinance's "actual performance of duty" were the same requirement *and* the facts of the instant matter met that requirement.[3] As we shall see, the facts of the instant matter do not meet either statute's requirements.

*Police Comm'r v. King, supra,* presented claims, based upon the death of a police officer, under two City benefit plans, referred to as the Trust Fund and the Special Fund. The test for benefits under the Trust Fund was whether the death occurred "while on active duty." *King,* 219 Md. at 131, 148 A.2d 562. Under the Special Fund the tests for eligibility were either, " 'killed while in the actual performance of duty' " or dying in " 'consequence of injuries received while in the discharge of duty.' " *Id.* at 133, 148 A.2d 562. Officer King died, at home and while he was off duty, as a result of an accidentally self-inflicted gunshot wound from his service revolver. In preparation for going on duty, the decedent had partially dressed on the second floor of his home, including donning his uniform belt and pistol holster. While descending

---

**3.** The issue may be conceptualized linearly. Assume a line with termini at points A and D. The line includes points B and C. Let AB represent that segment of the spectrum where claims are compensable under both the Act and the Ordinance, let segment BC represent claims compensable only under the Act, and let segment CD represent claims not compensable under either. If a claim falls in segment CD, it is immaterial where point B is located or whether points B and C coincide.

the stairs to the first floor with the pistol in his hand, he apparently slipped, causing the weapon to discharge.

With respect to the "active duty" contention, the Court said:

"We think the words 'while on active duty' refer to the nature and character of the duty being performed by a policeman at the time of his death or injury rather than to his general status in the Department. We, therefore, hold that a policeman is on 'active duty' within the meaning of the [Trust Fund] at all times when he is actually and in fact discharging his duties as a police officer. But even during these times the Fund does not function as general insurance. It does not entitle the widow and/or children to benefits for death under all circumstances and from every cause during the period of a policeman's duty. There must be some causal connection between the death or injury and the deceased's duty as a policeman."

*Id.* at 132–33, 148 A.2d 562.

With respect to the Special Fund, the Court said that the terms, "while in the actual performance of duty" and "while in the discharge of duty," had the same meaning as did "while on active duty" in the Trust Fund. Because the decedent "was off-duty and not performing or discharging any actual police duty at the time of his unfortunate accident," the Court held that there were no benefits under the programs under consideration.

Comparing the facts of *King* to the matter before us, it would appear that the need for uniformed police officers to be outfitted with their holsters and service revolvers, in order to report for duty, bears a closer relationship to their employment than the treadmill workout of Cpt. Hubbel, for his forthcoming fitness test, bore to his employment. The facts of the former, however, were too remote from the employment to qualify for "actual performance of duty" death benefits.

The Act's "course of employment" requirement was the basis of the claim in *City of Baltimore v. Jakelski,* 45 Md.App. 7, 410 A.2d 1116 (1980). Jakelski was a Baltimore City police officer who was injured in an automobile accident that oc-

curred while he was traveling in his private vehicle to testify at a traffic court session beginning at 2:00 p.m. At 3:30 p.m. that day, he was scheduled to report for his regular duty assignment. The City compensated police officers on an hourly basis for appearing in traffic court to testify on citations issued by them. Jakelski's claim was denied by the Workers' Compensation Commission. The circuit court reversed, concluding that Jakelski's duties included traffic court appearances. This Court concluded that Jakelski was not in the course of his employment when he was merely traveling to traffic court. Further, because the officer was scheduled into traffic court monthly, an exception to the going and coming rule for special errands was not applicable.

Under all of the circumstances in the *Jakelski* case, that off-duty officer's injury was more closely related, in time and space, to his employment objective than was Cpt. Hubbel's exercising at home on his treadmill.

The claimant in *Montgomery County v. Smith,* 144 Md.App. 548, 799 A.2d 406, *cert. denied,* 371 Md. 264, 808 A.2d 808 (2002), sought compensation under the Act for injuries sustained while exercising. Smith was a correctional officer at the Montgomery County Detention Center. One afternoon, after his work shift had ended, and while he was playing basketball in the Detention Center's gymnasium, he jumped, landed awkwardly, and injured both knees. The Workers' Compensation Commission held that the injury was compensable, and the circuit court affirmed by entering summary judgment. A County manual introduced by Smith stated that uniformed correctional officers in Smith's group were required to have " 'an extraordinary degree of physical fitness and mental health.' " *Id.* at 552, 799 A.2d 406. The detention facility's warden affirmed that correctional officers were subject to periodic physical examinations, but not to mandatory physical fitness tests, and that the County neither promoted nor discouraged participation in physical fitness Finding no facts or inferences that could support the award, this Court reversed and held that summary judgment should have been entered in favor of the County.

*Smith* considered the "course of employment" issue from the standpoint of two possible tests, the first we shall call the Traditional Maryland Test and the other *Smith* called the Larson Rule. The statement of the elements of "course of employment" appearing in *Knoche v. Cox*, 282 Md. 447, 385 A.2d 1179 (1978), has been frequently quoted in Maryland cases under the Act. There, the Court said that "[t]he words 'in the course of employment' refer to the time and place of an accident and the circumstances under which it occurs[.]" *Id.* at 454, 385 A.2d 1179 (citations and some internal quotation marks omitted). The Court further identified three elements:

> " '[A]n injury arises "in the course of employment" when it occurs within the period of employment at a place where the employee reasonably may be in the performance of his duties *and* while he is fulfilling those duties or engaged in doing something incident thereto.' "

*Id.* at 454, 385 A.2d 1179 (quoting *Watson v. Grimm*, 200 Md. 461, 466, 90 A.2d 180 (1952) and citing *Proctor–Silex Corp. v. DeBrick*, 253 Md. 477, 480, 252 A.2d 800 (1969); *Pariser Bakery v. Koontz*, 239 Md. 586, 590, 212 A.2d 324 (1965), and *Department of Correction v. Harris*, 232 Md. 180, 184, 192 A.2d 479 (1963)) (emphasis added). *See also Montgomery County v. Smith*, 144 Md.App. at 577, 799 A.2d 406; *Board of Trustees of the Fire & Police Employees Retirement Sys. of the City of Baltimore v. Powell*, 78 Md.App. 563, 567, 554 A.2d 440 (1989).

In *Smith*, this Court held that, under the Traditional Maryland Rule, the claim was not compensable. The claimant was not on duty and the gymnasium was not a "place where he would reasonably be expected to be in the performance of his duties as a guard." 144 Md.App. at 577, 799 A.2d 406. Nor was the activity incident to his duties, because he could have exercised "virtually anywhere" to stay in shape. *Id.* at 578, 799 A.2d 406. Cpt. Hubbel was off duty, at home, and he could have run or jogged virtually anywhere to stay in shape.

In *Smith*, we also looked to the cases, in Maryland and elsewhere, involving off-premises recreational or social activi-

ty, including *Sica v. Retail Credit Co.,* 245 Md. 606, 227 A.2d 33 (1967). In *Sica,* the Court stated that the following statement from 1 Larson, *Workmen's Compensation* § 21 was accurate:

" '22.00 Recreational or social activities are within the course of employment when

" '(1) They occur on the premises during a lunch or recreation period as a regular incident of the employment; or

" '(2) The employer, by expressly or impliedly requiring participation, or by making the activity part of the services of an employee, brings the activity within the orbit of the employment; or

" '(3) The employer derives substantial direct benefit from the activity beyond the intangible value of improvement in employee health and morale that is common to all kinds of recreation and social life.' "

*Id.* at 613, 227 A.2d 33. In *Sica,* the Court held that the claimant, who was seriously injured when he dove into shallow water at a company sponsored picnic, was acting within the course of his employment. The *Sica* Court explained:

"[T]he annual picnic was an express term of Sica's employment. The employer encouraged and authorized the formation of the picnic committee and its activities, paid all the expenses, and deducted its outlay as a business expense for income tax purposes. The picnic was advertised on the employer's premises, and the employees were urged to attend, although attendance was not compulsory. The nature of the employer's activities was such that its employees, such as Sica, spent a large part of their time 'on the street.' . . . [The picnic] brought together employees who saw each other much less than in the ordinary work of a factory, and the inference is clear from the testimony that the occasion promoted the enthusiasm which was a necessary element in the employer's service business."

*Id.* at 618, 227 A.2d 33,. Accordingly, the Court reversed the Commissioner's denial of any award.

This Court concluded in *Smith* that the Larson Rule did not support judgment for the claimant. We stated that the employer "did not bring the activity of playing basketball into the orbit of Smith's employment by expressly or impliedly requiring participation in the activity or by making the activity part of Smith's services." *Smith,* 144 Md.App. at 578, 799 A.2d 406. Here, if the Larson Rule, and not the Traditional Maryland Rule, is the applicable test,[4] the issue is whether the City of Baltimore impliedly required running on one's own treadmill to such a degree that we can overrule the Board and hold, as a matter of law, that that activity was within the orbit of employment.

## B. Appellant's Out-of-State Cases

Appellant directs us to several out-of-state cases in which injuries sustained while exercising were held to be within the course of employment. The cases demonstrate that, to find that off-duty fitness exercise is an employment requirement, the legal test must be more liberal, and/or the facts stronger, than in the matter before us.

Three of the decisions involved police officers in California who injured themselves while running, and in each case, a California court reversed the compensation agency and held that the injury was in the course of employment. *See Tomlin v. Workers' Compen. Appeals Bd.,* 162 Cal.App.4th 1423, 76 Cal.Rptr.3d 672 (2008); *Kidwell v. Workers' Compen. Appeals Bd.,* 33 Cal.App.4th 1130, 39 Cal.Rptr.2d 540 (1995); *Wilson v. Workers' Compen. Appeals Bd.,* 196 Cal.App.3d 902, 239 Cal. Rptr. 719 (1987). The applicable California statute made compensable injuries arising out of off-duty recreational, social, or athletic activities " 'where these activities are a reasonable expectancy of, or are expressly or impliedly required by, the employment.' " *Wilson,* 196 Cal.App.3d at 905, 239 Cal. Rptr. 719 (italics eliminated). All three cases were decided on the "reasonable expectancy" statutory alternative. That alter-

---

**4.** The factors in the Traditional Maryland Rule are conjunctive; those in the Larson Rule are disjunctive.

native ground for compensation required two elements, that the employee subjectively believed participation in the activity was expected and that the claimant's subjective belief was objectively reasonable. That standard is neither the Traditional Maryland Rule nor the Larson Rule.

In *Wackenhut Corp. v. Industrial Claim Appeals Office,* 975 P.2d 1131 (Colo.App.1997), the employer, the operator of a security guard service, required the guards to undergo physical stamina tests, maintained a gym on the work site, and paid its employees to participate in physical activities at the gym. In *Southeastern Pennsylvania Transp. Auth. v. Workers' Compen. Appeal Bd.,* 730 A.2d 562 (Pa.Commw.), *appeal denied,* 560 Pa. 715, 743 A.2d 925 (1999), the claimant, a transit police officer, twisted his knee while running in a park in order to meet the running requirement of the employer's physical fitness standards. The employer tested police officers four to six times per year, and the officers could be subject to progressive discipline if they did not meet the physical fitness standards. *Id.* at 563. The employer encouraged the officers to keep fit by providing up to $240 per year for gym memberships and gave cash awards for successfully achieving interim fitness goals. *Id.*[5]

In the case before us, Cpt. Hubbel was on his own for training if he wished to remain a member of the Team. There is no evidence that Baltimore City provided incentives, to the degree described in the Colorado and Pennsylvania cases

---

5. Appellant also refers us to *State Indus. Ins. Sys. v. Weaver,* 103 Nev. 196, 734 P.2d 740 (1987). Being in the course of employment was not an issue in that case. There, "[t]he Department of Energy, through the employer, required a nearly sixty-year-old man whose duties did not normally include any running to run one mile in eight-and-a-half minutes through the southern Nevada desert, in July, in order to retain the job he had held for seventeen years." *Id.* at 742. The employee in *Weaver,* a security inspector, died of a heart attack moments after completing the required run. He was not off duty, at home, training on his own. The issue in the case was the applicability of a Nevada statute providing that any "ailment or disorder of the heart, and any death or disability ensuing therefrom, shall not be deemed to be an injury by accident sustained arising out of and in the course of the employment." *Id.* at 741 n. 3.

reviewed above, from which it could be found that maintaining a specified level of physical fitness was a part of Cpt. Hubbel's employment services, much less to reverse the finding of the Board's Examiner to the contrary. Many persons of Cpt. Hubbel's age run regularly to maintain fitness, with no incentive other than good health. Phrased another way, Cpt. Hubbel's potential loss of his assignment to the Team, were he eventually unable to meet the physical fitness standard for that special, additional duty, is not enough to bring his off-duty, off-premises exercise into the Act's "course of employment," even under the Larson Rule.

## C. The Examiner's Course of Employment Analysis

 Here, the Examiner's analysis of the course of employment/actual performance of duty aspect of compensability is somewhat internally conflicting. She said:

> "If this was a workers' compensation case, I would have no trouble finding that the act of exercising on the treadmill was an activity that arose out of [sic] Officer Hubbel's employment. His actions in preparing himself for the physical fitness requirements of his employment and the upcoming fitness test were an obligation and condition of his employment."

The Examiner seems to have, in the quoted paragraph, mixed the two aspects of compensability under the Act. "[A]rising out of the employment" refers to the cause or origin of the accident, whereas "in the course of employment" refers to the place, time, and circumstances of the accident. Knoche, 282 Md. at 455, 385 A.2d 1179. Further, there is no evidence that meeting the requirements of the fitness test was a condition of employment. Even if Cpt. Hubbel failed the test and did not retest successfully within the succeeding six months, he would not lose his position as a captain in the Baltimore City Fire Department. He simply would be ineligible to remain on the Team.

The Examiner next quoted the Traditional Maryland Rule, and said:

"If Officer Hubbel had suffered the heart attack while at the scene of a fire, or during a rescue operation, those circumstances would clearly fall within the time and place requirements of the statute. However, in this case, while Officer Hubbel may have been engaged in an activity incident to his employment, he was not within the period of employment or at the location of his employment when he was exercising at home on his treadmill during his off duty hours. To allow that he was within the period and place of his employment whenever and wherever he exercised, because his employment required him to remain fit, is an extension of the law I am unwilling to make."

Thereafter, the Examiner expressed the view that the Ordinance required "something extra."

We read the agency's opinion as first holding that Cpt. Hubbel's exercising on the treadmill at home was not sufficiently incidental to his employment to bring it within the course of that employment. Based on the cases reviewed in Parts I.A and I.B, *supra*, that holding, under the facts of this case, was not erroneous. Indeed, had the Examiner found that Cpt. Hubbel was in the course of his employment, that conclusion would have been subject to reversal under *Smith*. Because the activity was not within the course of Cpt. Hubbel's employment under either test of the Act, the Examiner's statement that the Ordinance required "something extra" is immaterial, not prejudicial, and not a basis for reversal.

## II. Arising Out Of

 The Ordinance also requires that the injury or death arise out of the actual performance of duty. " 'Arises out of' refers to the causal connection between the employment and the injury. An injury arises out of employment when it results from some obligation, condition, or incident of employment." *Livering v. Richardson's Restaurant*, 374 Md. 566, 574, 823 A.2d 687 (2003). The appellant here argues that, because she "has proven that Cpt. Hubbel's death arose out of and in the course of the actual performance of duty, this Court need not reach the question of substantial evidence." Appel-

lant did introduce evidence that Cpt. Hubbel's employment and training program "played a considerable role" and "a significant role" in his death. But appellant did not persuade the finder of fact that the death arose out of the employment. Rather, the Examiner was persuaded by the Board's expert who concluded from the medical records that Cpt. Hubbel "had non-occupationally related coronary artery disease" that caused his death.

Basically, on the "arising out of" aspect of this case, the Examiner's decision rested on the principle that, although the Act is to be interpreted and construed to effect its general social purpose, it does not insure workers against the common perils of life. *See Knoche v. Cox,* 282 Md. at 455, 385 A.2d 1179; *Sica v. Retail Credit Co.,* 245 Md. at 612, 227 A.2d 33; *Tavel v. Bechtel Corp.,* 242 Md. 299, 303, 219 A.2d 43 (1966). Under the Examiner's finding, Cpt. Hubbel's death was not traced to the employment as a contributing proximate cause. The death, under the evidence accepted by the Examiner, came "from a hazard to which the workman could have been equally exposed apart from the employment[.]" *Kletz v. Nuway Distributors, Inc.,* 62 Md.App. 158, 164, 488 A.2d 978 (1985) (holding that, where infection contracted on business trip to Hong Kong could not be causally connected to employee's death, there was no coverage under the Act).

The basis of decision in the instant matter was what Larson identifies as "Risks Personal to the Claimant." 1 *Larson's Workers' Compensation Law* § 4.02 (2009). The author explains:

"At the other extreme are origins of harm so clearly personal that, even if they take effect while the employee is on the job, they could not possibly be attributed to the employment. If the time has come for the employee to die a natural death, or to expire from the effects of some disease or internal weakness of which he or she would as promptly have expired whether the employee had been working or not, the fact that the demise takes place in an employment setting rather than at home does not, of course, make the death compensable."

Appellant also argues that Dr. Parkerson's opinion could not constitute substantial evidence because that expert did not have the emergency medical technicians report, the post-death report of Upper Chesapeake Medical Center, and the fitness requirements for continued participation on the Team. The information contained in the medical records of Cpt. Hubbel, while living, contained substantial evidence to support Dr. Parkerson's opinion and the Examiner's findings. Appellant's criticisms go only to the weight of the evidence.

For the foregoing reasons, we shall affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE CITY AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANT.**